May it please the Court, Katie Chang on behalf of Appellant Raul Barajas-Romero, I will be addressing the withholding of removal arguments and my colleague Mr. Michael Reynolds will be addressing the Convention Against Torture Issues. We would like to reserve one minute for rebuttal. All right? This Court should reverse the decision of the BIA and remand for entry of withholding of removal. First, because the BIA inappropriately applied to Mr. Barajas' withholding of removal claim, a standard that only applies in asylum cases, and second, because Mr. Barajas is substantively eligible. If the one central reason test applies to withholding removal claims, does your client lose this case? As to the withholding? No, Your Honor. Under Percivmova v. Mukasey, the one central reason test does not require that there be only one central reason. There may be multiple central reasons. And in this case we would argue that the extortion and the refusal to accede to corruption as well as Mr. Barajas' explicit anti-corruption declaration show that he was persecuted on account of his political opinion under the one central reason test. The facts here show that the police got very angry after Mr. Barajas made this declaration. They immediately reacted. They started, they escalated the attacks they made on him. Before the attack, they were trying to wear him down and not to minimize what was done to him, but they didn't threaten his life. After the attack, they immediately start using scorpions on him that make him swell up, make it hard for him to breathe. They slash his leg with a machete. They threaten to kill him if he's ever seen in Mexico ever again or if he tells anyone about this. The way it sounds from the materials attached, nobody really governs all of Mexico. And that's why these cartels are there in the first place. So why couldn't he go someplace else in Mexico? Your Honor, relocation is an issue with regards to Convention Against Torture in this claim. As to withholding of removal, that argument, the BIA and Mr. Barajas both agree that that issue is not before this court. As to relocation, under the Convention Against Torture, which my colleague can address further, under the Perez-Ramirez case, where there has been past torture, the burden shifts to the government to show that the applicant cannot relocate. So we would argue that in this case, Mr. Barajas did not show that he could not relocate. But there are facts to show that he also can't relocate in this case. The La Familia Michoacan cartel has national reach. It transports drugs from South and Central America through Mexico to the United States. It is also allied with national cartels. And they threaten to kill Mr. Barajas if he was found anywhere in Mexico. So those facts show that the police took a look at him and told him they would shoot him there if they ever saw him in Mexico again. There is a picture in the record, Your Honor, and I can find the record site for rebuttal if you'd like. It's like little rubbing marks. They're like scars and dots on his forehead. Turning back to the withholding argument, if there are no further questions on relocation for now, the statutory language is very clear that Congress did not intend the One Central Reason test to apply in withholding of removal. If you look at the text of the Real ID Act, Congress added three provisions to the asylum statute. The One Central Reason test, a burden of proof standard, and a credibility standard. Why would one of the five grounds even be a reason? It looks like the cops didn't care what his views on corruption were. They just wanted his money. Your Honor, they did start off wanting to extort him, which is exactly what happened in the Dazeer case. And under the Dazeer case, the police were motivated, at least in part, because of Mr. Barajas' political opinion. And in this case, it looks like they were just motivated because he looked like a guy who had some money. Under the Dazeer case, Your Honor He didn't express any opinion about corruption or anything else political. He just resisted giving him the money. He said, I'm not going to give my money to any crooked cops. Your Honor, so he didn't make an anti-corruption statement, as Your Honor referenced. Yes, after they decided to oppress him and persecute him in order to get his money. Yes, Your Honor. But under the Dazeer case, this Court has held that retaliation for resisting corruption in a culture of institutionalized corruption is persecution. He was retaliating because he resisted corruption. Again, it just looks like all the bad things they did to him, this evil torture, was just to get his money. Your Honor, it started off that way. They held him for three days trying to wear him down. They continually asked him for money and made him call his mother in order to get money. But after he says that he's not going to pay the cops because they are corrupt, the violence significantly escalates. They are threatening his life. They threaten to kill him. If your evidence is circumstantial evidence, we should infer because the torture got worse that it must have been because of his statement, I'm not going to give any money to corrupt cops. Your Honor, that evidence definitely supports our position. But also under Dazeer, simply resisting corruption in a culture of institutionalized corruption is sufficient for persecution on account of political opinion. And the same kind of... Well, wait. So is your argument that if he had never made that statement, we could just infer the same thing then? Yes, Your Honor. Under the Dazeer case, fewer resistance. And I'll just outline the facts of the Dazeer case. Just not giving over the money. Yes, Your Honor. In the Dazeer case, the court never noted that the applicant made any sort of statement. He simply refused to give in to the Haitian security forces when they demanded money. And so the court reasoned that because the cops imputed a subversive political view to him because he was not paying the cops and acceding to their political extortion, that that was persecution on account of political opinion. And that's the same thing that we have here. The La Familia Michoacan cartel works with the police to dominate Michoacan. Mr. Rojas testified that the whole town knows that they work together. There's a congressman who's high-ranking in the La Familia Michoacan cartel that's charged with providing institutional protection. So this is the same kind of political control over the state. And so anytime you have a corrupt cop going after somebody, trying to extort money, in your view, under the Dazeer case, that is persecution on account of political opinion? No, Your Honor. I don't think we need to go that far. Because it's not just a corrupt cop, a rogue cop. There has to be the same kind of political control and institutionalized corruption that exists in the Dazeer case. Is Dazeer still good law? I notice it's 1988. And I can't remember, but I think that may be before Elias Zacharias. Your Honor, our position is... Elias Zacharias and a whole line of authorities say the reason for the persecution has to be in the mind of the persecutor, not the mind of the victim. Yes, Your Honor. But the evidence here shows that the police correctly imputed to Mr. Rojas an anti-corruption political opinion and retaliated... Wait a minute. That was because the torture cop was saying for Elias' remark. Yes, Your Honor. But you're saying he wouldn't have even had to make the remark under Dazeer. And what I'm asking you is, is Dazeer still good law? Yes, Your Honor. Under Dazeer, the police can still view someone as subversive when they don't give in to institutionalized corruption and extortion. And if they treat someone in that way, then that can still be persecution on account of political opinion. And in the police's minds, you're retaliating for that reason. Can I ask you to go back to the statutory argument you're making? Sure. And you were going through why you think the statute is clear that Congress didn't intend to sort of incorporate into the withholding statute the one central reason test. But help me with Zatino, because it seemed like in Zatino we held that, rightly or wrongly, that the one central reason test did apply to both. Yes, Your Honor. In the Zatino case, the court never had to reach that question. They found that there was no nexus to a protected ground whatsoever. And so they didn't need to actually analyze or address the question of whether or not the one central reason test did apply in withholding of removal. There was no nexus at all. And the opposite happened in the Who v. Congress case. But I'm just looking at the passage, and we state plain as day, it seems to me, and I think you probably memorized the passage, it states plain as day that the standard applies across the board to asylum and withholding. You can argue about whether that was in some way essential to the actual disposition in that case. But that is what the case says. And what are we supposed to do as a three-judge panel with that? Your Honor, the case does say that. But that statement is dicta because they did not need to reach that argument. Because there was no nexus to a protected ground, that issue was never really before that panel. And so it's still an open question as to whether the one central reason test applies in withholding of removal. Furthermore, the text of the withholding statute is very clear. What about matter of CTL? Matter of CTL is a BIA precedent, arguing that the one central reason test does apply in withholding of removal. However, the statute in this case, Congress has clearly expressed its intent, and matter of CTL goes against Congress's clearly expressed intent. Congress actually set the section that Congress added to the withholding of removal statute, 8 U.S.C. 1231b3c, actually says that an applicant is eligible if their life or freedom has been threatened for a reason listed among the protected category grounds. And Congress is drawing a distinction here between a reason in the withholding statute and the one central reason in the asylum statute. And this Court should give meaning to that distinction because Congress has shown that it's a higher standard for asylum than for withholding, as recognized actually in the Zatino case, this Court said that it was an additional burden for asylum applicants. So your argument is that there's no ambiguity in the statute, and so we shouldn't give the precedential BIA decision any Chevron deference? Yes, Your Honor, that is the position. And at this time, I'd like to give my colleague, Mr. Reynolds, time to address the Convention Against Torture. Sure. Unless one of my colleagues has a question. All right. Thank you. Thank you. Good morning, Your Honors. I'd like to briefly address two issues with the BIA's decision to deny relief under the Convention Against Torture. Both these issues were addressed by recent Ninth Circuit cases, and both those cases require reversal in this matter. The first issue is, while the BIA acknowledged he was certainly tortured, it held that the Mexican government did not inflict that torture or acquiesce in that torture based on evidence that the Mexican federal government was attempting to combat police corruption. What about acquiescence? I've been trying to figure out the context of this case, how the word acquiescence applies. What it looks like is, the Mexican central government would dearly love to eliminate these cartels and the lawlessness in the areas governed by the cartels, so they don't acquiesce in the sense of it being all right with them. But they also have not been successful in imposing national governmental authority over these areas, which is a considerable part of Mexico. That's absolutely correct. Does acquiescence refer only to the subjective intent of the government, or also its ability? It refers to both the intent and the ability. So that's what the Madrigal v. Holder case says. What's the case? Madrigal v. Holder. Thanks. It says that the BIA must consider both the intent, willingness to combat the corruption, and the efficacy of those efforts. It also holds that you cannot just look at whether the federal government or the central government is acquiescing in torture. You also have to look at whether the state or local governments might also be acquiescing in torture. And in this instance, the evidence is clear that the local government here certainly is acquiescing in the type of torture that Mr. Barajas suffered. The evidence there is that it was local government police that did it? Exactly, Your Honor. Uniformed police came to his house, gained entry to his house based on their position as police officers. Sometimes the local government does not acquiesce in what corrupt police do. For example, back in the 70s when there was a lot of corruption in the New York City police, as fast as they could catch them, they put them in jail, the corrupt policemen. Yeah, absolutely, Your Honor. I think there could be situations where the police and the local government are at odds or not in cahoots. Here, there's just no evidence that the local government is doing anything to stop the police. Did you say uniformed police officers? I had recalled that it was actually off-duty officers. Your Honor, he referred to them, he, Mr. Barajas, referred to them as off-duty police officers. But what the record shows is that they were in their fatigues, they were in police t-shirts that say policia across the front, and in their boots, and they came to the door in that uniform. They didn't have their outer coats on, but they certainly were identifiable as police. And I would like to address the second point, which is the relocation argument, and specifically who bears the burden of showing that Mr. Barajas, whether Mr. Barajas could relocate. And this is squarely addressed by the Perez-Ramirez case, which held that when an applicant has suffered past torture, the burden shifts to the government to show that he, that Mr. Barajas could safely relocate. Is this covering on his forehead supposed to be a mark of pain so that all the gangs recognize this guy shouldn't be here? Your Honor, it's... Or is it just a remnant of the torture like some others? The answer to that is, it's unclear. There's nothing in the record to show that it was an actual, you know, identifiable mark that, that, you know, the cartels are using. That anywhere he goes within Mexico, there'd be a problem because they'd recognize that mark immediately. There's nothing in the record. There's no evidence of that. That's correct, Your Honor. There's no evidence of that. It may or may not be what the, the attorney below basically said she didn't have time to look that up. So there is, that evidence is not in the record. If you disagree with you that the burden is on the government and it is the petitioner's burden to demonstrate the relocation issue, has he met that burden? Yeah, he has, Your Honor. First of all, the police officers that tortured him told them they would kill him anywhere in Mexico. Those officers are known or suspected to be affiliated with a cartel that operates nationally, that is affiliated with other cartels that operate nationally. And, and he's been attacked. I just want to make this point. He's been attacked twice by members or by people affiliated with this cartel, not just this police attack. But several years prior, he was attacked by four members of the cartel, thrown off a bridge and nearly killed. He reported that to police. The police did not investigate. And then he was attacked several years later by police who were affiliated. So your argument is that because the cartel, cartel operates nationally, even though the Mexican government is attempting to curb the influence of the cartel and obviously there are elements within the police who are not complicit with the cartel, because there's, there's some rogue cops in every city, therefore he can't locate anywhere. I, I would like to reserve some time for rebuttal, but let me, let me answer your question. What the State Department report in this case, the record in this case, the same State Department report that was cited in the Madrigal case, says that local police throughout Mexico are known to collaborate with cartels and, and are corrupt. So I, I don't think it's fair to characterize this as several rogue cops. Basically every cop that appears in the record here has, has done, you know, either filed a false police report or tortured him. There's, there's no, there's no evidence that this is just a rogue cop, you know, localized scenario. This is, this is something where there's cartels that are operating nationally, national government has not been able to curb this cartel activity. And, and it, he, he does face the danger of being tortured, likelihood of being tortured having been targeted twice in the past, in just the eight years that he was in Mexico, if he's returned to Mexico. Thank you, Your Honor. May it please the Court, Your Honors. Tim Remitz on behalf of the United States Attorney General. On this immigration case, Petitioner Raul Barajas seeks review of decision of the Board of Immigration Appeals and has reinstated removal proceedings challenging, or withholding only proceedings challenging whether or not he met his burden of proof for withholding    Yes. He was not a whistleblower. It's not as though he reported these police to the central authorities for corruption and published a pamphlet on corruption and then they came and got him. Instead, the facts here are, they came to him to extort money and they were vicious from the start and let's assume they got a whole lot more vicious in their torture after he said, I'm not going to give any money to corrupt cops. Is there a case that says that that is or is not sufficient for political opinion persecution? I'm not aware of any case where that's sufficient, but I'd like to start with the extortion scheme to show there was never a time, on this record evidence at least. My real interest was case law because I think that this year case, is it pre-Elias Zacharias? It's 1988 and I'm not, I think in 1992 it was Elias Zacharias, so. So I think too. So I think it was pre-Zacharias and that means now we have to find the corrupt cops getting madder when somebody says, I won't give money to corrupt cops. So it might motivate them. Is that enough for political opinion persecution? No, we'd argue it's not. But even in this record. Is there a case law that says it is or it is not? I'm not familiar with the case law one way or the other on that. We're mostly concerned with the facts of this case. You've got some language in cases about resistance to corruption, but it's the nature of the resistance that I'm asking about. Yes. Does it have to be some sort of public opposition or does it just have to be a response to the corrupt individuals? I'm not sure, Your Honor. I don't know about any case law. I did not prepare myself for a case law on anti-corruption opinions because in this case there's no facts whatsoever showing that the police retaliated for him on that basis. Well, there's some facts. The torture was pretty significant throughout his ordeal. If you say something offensive to somebody who's beating you up and then he beats you up worse, you can infer from that that he didn't like what he said. In this case, the most you can infer is that they were taking further efforts to get money out of him. Since the established motive at that point, from those two days prior up until then, was always that they would do whatever they could to pry money out of him. It started on the first day where they entered his home in a manner. They pointed to the improvements he made to his house. Improvements that he'd used his mother's money to buy and he said he'd just got finished putting away. Before or after he said I'm not giving any money to corrupt cops? Before. Two days prior. What was the nature of the torture? I thought all they did was confine him basically until he made the remark. I believe they hit him with a machete prior to that remark. They beat him up. They locked him in the bathroom for two days. And this was all prior to that comment. I think all that happened after the comment. The machete? Slicing his leg with a machete, which I think happened after that comment. And the scorpion stings. But there was significant mistreatment before that where he states being beaten up, hit with a machete, beaten with fists, I believe. Hit with a non-cutting part of a machete before that? Blunt. It doesn't specifically say, but you have to assume it's blunt because it doesn't describe any kind of cutting. My recollection actually is similar to Judge Watford's. I'll have to go back and look at it again. But I thought the way he described it was that they had locked him in the bathroom, obviously attempting to extort money from him. Then when, as soon as he said immediately upon his statement that even if I had money I wouldn't give it to corrupt cops, they grabbed him and said something along the lines of, well, you don't tell me what to do or you don't tell us what to do. You listen to us. Threw him in the bathroom and then really the beatings, the persecution really escalated from that point. The whole corn husk on his forehead, hitting his legs with machete, the scorpion. And so I think if we don't agree with the government's position that the one central reason test applies to withholding removal claims, I think there's a good chance that he's demonstrated that his expression of anti-corruption views and the escalation of the torture thereafter was a part of the persecution. Isn't that a fair reading of the record? I don't believe he even succeeds under the least in part theory because there's, as was pointed out in a brief, that's really a proof of a negative because he experienced serious mistreatment and actually prior to that statement he was burned with cigarette burns and he showed that in his testimony and in the court they beat him, they burned him with cigarettes, they beat him and then... Burned him with cigarettes before? Before. At the remark? Yes. Well, let's look at it from just a common sense layperson perspective. Somebody's beating you, trying to get money out of you, and you resist, you resist, and they beat you some more, and then finally you tell them off, essentially, and they get angry, that's understandable, easily imaginable, and then they throw you back in the bathroom and then they escalate the torture. Let's say they even torture you again at the same level of seriousness as before. You're saying it's not fair to say that that anger was in retaliation of your abuse? There's nothing showing that. But you can't get into somebody's head, so it would have to be kind of a common sense inference of what does it show as soon as he said that statement. Yes, I would like to know if these are inferences. So when there's two reasonable interpretations of the evidence, which there certainly could be at this level, that doesn't meet the standard, the substantial evidence that meets the standard. That standard states that's the compelling record evidence to establish that particular motive. And everything we've talked about, it's all about, well, now we can infer that, whether it's reasonable to infer that, and it could be reasonable. However, it does not compel the conclusion contrary to the agency's that that was the motivation. When every other indicator in the record and every established, there's a for sure established motive. If we find that the one central reason test doesn't apply to withholding of evidence, would it be appropriate for the BIA to take a look at it under the appropriate test in the first instance, instead of having us pass on that issue? Well, the board has passed an issue decision matter CTO, which stated the central reason test does apply. Right. Well, they've said that. If we disagree with that, and we accord no Chevron deference to the BIA decision of matter of CLT, would we then have to remand the case? You would have to remand for the board to do their own thing. I have difficulty deferring to the BIA on that. Let me explain why. It's pretty standard statutory construction that you don't treat words as surpluses and you treat different words as having different meanings. Also, when the BIA corrected some Ninth Circuit decisions that said a lie had to go to the heart of the case, that sort of thing, and it looked like Congress was paying close attention to the exact words they used and the sort of decisions they were concerned about. So I see that in asylum, they say one central reason. They don't say the central reason, just one central reason, which is milder than the central reason. And then in withholding, they say a reason, and they don't say it has to be central. It's really hard for me not to attribute meaning to the presence of central in one, in asylum, in the absence of central and withholding. Now, I'm not sure it makes any difference in this case, because a central reason is, doesn't require the central reason. I'm not sure it makes any difference, but I also can't see how you could construe those two phrases to mean the identical thing. Let's also, when you look at what Congress said in the REAL ID Act, you also look at what they did not say. There was years and years of precedent before the REAL ID Act by this Court, every Court, and the Board, which always treated the factual nexus determination the same. Not to spare it for asylum holding removal. It was always the same. Congress made no mention that they ever intended. Were the words different when we treated it the same? Well, the words were not different. But when they enacted the REAL ID Act, the words were clear in the Act itself, which stated they wanted to create a uniform standard for nexus persecution determinations because of inconsistent application from the courts of appeal. In particular, this circuit's law about the least in part theory, they wanted in mixed motive cases to supersede that specifically and create a more onerous burden for persecution claims. The REAL ID Act also notes that asylum and withholding has always been treated as part of the same application. They don't mention the central reason test in the withholding removal, but they do mention that asylum and withholding has always been treated as part of the central reason or the REAL ID Act. However, they also did not say they meant to overturn. The EIA is treating these different statutory phrases alike because they have not changed and the courts have long treated them alike. That's one of the reasons, and also with the congressional intent that was clear in the REAL ID Act. They wanted to create a more onerous burden for, and a also make little sense to have a disparate burden of proof that was in fact lower for nexus determinations for withholding than it is for asylum when withholding, as the Supreme Court has stated, is an actual higher burden than asylum. I thought, though, that the, I don't know if it's in the legislative history or whatnot, but I thought the motivation was to cut down on the over-granting of asylum, not so much the over-granting of withholding. So if that's true, then it might make sense to have there be these two different standards. I believe the REAL ID Act discusses preventing fraudulent claims and claims by, it actually goes, discusses terrorists who have been able to stay in the country by virtue of asylum withholding and removal. And therefore, its intent was to create a more onerous burden in mixed motive cases to weed out these claims potentially. To make it more difficult, and therefore, it would make little sense to treat them differently and have a lower standard for withholding and removal subsequent to the REAL ID Act. When at all times prior, it was always the same burden, and at all times since, all courts of appeals have implicitly assumed that it continues to be that way without any expression from Congress that it should be different. Right. But just help me then with understanding the withholding statute. Why wouldn't Congress have just said, instead of just incorporating, you know, sub-clauses two and three, why wouldn't it have just said all three? I don't understand why it wouldn't have deliberately left out one if it wanted to do what you're saying. It seems to be merely an oversight when you take into the intent of the REAL ID Act and all the prior case law. There would have to be some intentional expression of Congress to overrule treating them differently. There simply is not an incorporation. That's silence. Yeah, well, but it seems quite deliberate, right? No, silence is not conclusive in this case when you have the entire intent of the REAL ID Act to create a more onerous burden for persecution claims, which are asylum withholding and removal, in which the REAL ID Act states have been misutilized by particular aliens to gain entry into the country. Have other circuits specifically confronted this question and agreed with your reading of the statute? So far, our court has yet to either shoot down MATTER CTL or accept it. The Second Circuit has many unpublished decisions where they defer to MATTER CTL. Do you read our Zatino case to have already resolved this, or do you think you agree with your opponent here that it's an open question? I believe it's quite resolved, because the REAL ID Act was enacted in 2005 for persecution claims that came after 2005. And since then, every court of appeals has considered the issue, has implicitly assumed that everything remains the same. There's no reason to create a new disparate burden of proof for asylum withholding and removal without Congress ever saying that was ever their intent and overruling all the prior case law, which always treats it the same. So basically, you want us to just agree the words of the statute as an oversight? Yes. Well, you rely quite a bit on legislative history in your argument today with regard to the one central reason argument, but wasn't there some effort by the legislature to actually amend the statute to incorporate the one central reason test to the withholding of removal claims? And I thought those efforts failed. So that seemed to me to be an indication that Congress really recognized that there was a difference between asylum and withholding claims. Congress fails at a lot of things right now. And they have not been able to come to a comprehensive immigration reform agreement. That doesn't mean that there was not this congressional intent earlier when they enacted the 2005 bill. I most have heard that they are trying to correct this oversight, but I can't point you to anything that specifically says that. But their failure to come to an agreement over the many moving parts of comprehensive immigration reform does not in any way should influence the interpretation of this. Oh, by the way, before you run out of time, I thought that the appellants or the petitioners were correct in saying that under the Convention Against Torture Act, once the person has been tortured, the government has the burden of showing that the person could safely go back, perhaps by relocating. Is that correct? No, that's not correct. This Court stated in Hassan v. Ashcroft, 2004 case, which specifically analyzed the two burdens of proof of play, and that the Court stated that they are different. For withholding and asylum claims, where there is past persecution, the burden shifts to the government per the regulations. There is no similar regulation for CAT claims. In fact, the regulation says to the contrary, the burden remains on the petitioner to always establish that these factors apply to his claim. And one of them is that the petitioner can show reasonable relocation is not possible. And that's in the regulation. That burden is on the petitioner. The case they cite is a later case. Let's suppose you're correct on that. Why don't they have enough in the absence of any evidence put in by the government to the contrary by showing that they do have this, these physical characteristics that basically they've been made so is noticeable. And they have shown, I think, through the documents they submitted, that the two of them are very similar in nature to each other. Why isn't that enough in the absence of any evidence to the contrary from the government? Well, again, as we stated, his burden, and he testified, he's never attempted to live outside of his hometown. In fact, 30 days after this incident, he went to the United States. That's his burden to show he could not internally relocate for that portion. Where all this flaw came from, in an actual way I would think of, if I have managed to get out of any place in Germany and I have a number tattooed on my arm, no matter where I go, I better not wear short sleeves. Yes. Well, we'd like to address the pain time. So why isn't the naming going to operate like that with other cartels? Well, as we noted in the petitioner's argument, there's no evidence record that this naming was purposely to identify him and for these perpetrators. It doesn't have to be a mark of pain, I don't think. I mean, especially when somebody is named, people say, gee, poor guy, what happened to you? Right. But that wouldn't mean that he would be a target for anyone else at that point. Do I have any time to address the acquiescence argument? Go ahead and finish your answer to Judge Kleinfeld's question. Well, the acquiescence, as Madrigal states, as we talk about that for a second, if public officials at the state and local level in Mexico would acquiesce in any torture, the petitioner is likely to suffer, this satisfies Katz's requirement that a public official acquiesce in the torture. In that case, there was not any local response. The local police were complicit in the action. In this case, we have substantial testimony that shows the local police responded to the scene. When the police were called, they responded with his cousin to the scene, they took his report, they interviewed him, and they made a police report. Well, it's debatable as to whether there's follow-up, but we understand your argument. Thank you very much. Just a couple of points on rebuttal, Your Honors. First, as to the statute, government counsel just said that he would like this court to treat the words of the statute as an oversight. However, this shows that their position is untenable. This court cannot just ignore the words that Congress has used in enacting a statute.   In the legislative history, the drafters showed that their intention was to make the asylum standard uniform across the circuits, but not to make it uniform between asylum and withholding. They furthermore showed this because they noted the differences between asylum and withholding when they discussed the withholding statute, such as that asylum applicants can naturalize, they can bring their families. Withholding applicants can't, and they can be deported to a prison. They can't be deported to any other country where their life or freedom would not be threatened on account of a protected category. The Convention Against Refugees also supports this distinction, as argued in our opening brief. Withholding of removal, which corresponds to non-refoulement, is mandatory on states. They cannot deport someone to a country where their life or freedom would be threatened. However, for asylum, the convention just says that states should go as far as possible to facilitate asylum. That gives states a lot of discretion in terms of the standards that they use in granting asylum to applicants. But you're not saying that the treaty dictates the one central, I'm sorry, that the treaty dictates the prior test? No, Your Honor, just that it supports the distinction that Congress has drawn here. You've got two cases, basically, for his resistance to corruption being a political ground. His resistance consisted solely and entirely of his remark to the cartel cops, cartel-associated cops, I'm not going to give money to corrupt cops. Now, one of them, De Seer, looks to me as though it's no longer a good law anymore. It doesn't cite Elias, and I think it precedes Elias. The other one, Fiduniak, I just refreshed my recollection on it, and I think that fellow, Fiduniak, he, when he was being extorted, he complained to the tax commissioner of the country. He explained, or maybe it was the town, he complained to the mayor of the town. He was making a lot of public complaints about corruption, and the mayor told him, you better shut up about corruption. Here, it doesn't look as though there's anything in the nature of whistleblowing or complaining to the authorities. Not that it would have done any good, but it looks like the most you can say is that the attack worsened when he talked back to the cops, the same way you're more likely to get a ticket if you talk back to the cop that asks you for your license and registration. I don't know if that counts as resistance to corruption. It looks like we'd probably have to publish if it does. Is there any better case? Your Honor, we believe that the Dazeer case is still good law. You haven't told me anything about whether it precedes Elias Zacharias. Historically, it does precede Elias Zacharias, but it was about persecutor motive. Elias Zacharias saying it's about what's in the persecutor minds doesn't change that. A persecutor can still have an impact. What it said was that Haiti was a kleptocracy, and anybody who resisted turning over his money was going to be treated as political opinion persecution. That would not stand up after Elias Zacharias. What the Dazeer case shows is that the police in the system imputed to the applicant in that case a political opinion, and they were retaliated against him for the political opinion. Elias Zacharias says that the victim's opinion doesn't matter. Right, Your Honor, but imputation of political opinion does still matter. It doesn't necessarily matter whether or not the applicant himself has the political opinion, so long as the people who are persecuting him impute to him that political opinion. And that's what the Dazeer case shows, is that the Haitian security forces were imputing to the applicant a subversive political opinion. And that's what the Mexican police did here. They just correctly imputed that. I don't even remember discussing imputed political opinion. Your Honor, it is in the Dazeer case. It is in the Dazeer case. And just one other point, if there are no other questions on that. As to the Hassan case, Hassan preceded Perez-Ramirez, and the applicant in that case was never tortured, so the court had no occasion to address whether or not torture would shift the burden. Perez-Ramirez is, I believe it spoke directly on that issue as to who's got the burden. So you've got Perez-Ramirez, they've got Hassan, and it may be that we all have to reconcile those two cases. Thank you very much for your arguments today, and I thank you, we thank you especially for your participation in the program. Thanks to Pro Bono Council for both of the matters on calendar today, and I hope that it's been a great experience for you. Thank you, Your Honor. Thank you.
judges: Kleinfeld, Nguyen, Watford